AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT



for the

Central District of California



| | |
|---|---|
| United States of America<br><br>v.<br><br>Juan Pulido-Pech, Ricardo Alcantara, Juan Escarciga, Sergio Villapando, Eliseo Benicia, Jamie Alvarez, and Rafael Garcia,<br><br>Defendants. | Case No.  5:25-mj-00088 |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  In the counties of Riverside, San Bernardino, Los Angeles, and Orange, in the Central District of California, the defendants violated the follow statutes on or about the following dates:

| Code Section | Offense Description | On or about: | Defendant: |
|---|---|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute 50 Grams or More of Methamphetamine | July 8, 2022 to October 12, 2022 | Juan Luciano Pulido-Pech |
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute 50 Grams or More of Methamphetamine | July 21, 2022 | Ricardo Perez Alcantara |
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute 50 Grams or More of Methamphetamine | July 28, 2022 | Juan Manuel Escarciga |
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distribution of 50 Grams or More of Methamphetamine | July 28, 2022 | Sergio Eduardo Villapando |
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) | Distribution of 400 Grams or More of Fentanyl | August 3, 2022 | Eliseo Benicia |

///

///

///

AUSA: Peter Dahlquist

| | | | |
|---|---|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) | Distribution of 400 Grams or More of Fentanyl | August 23, 2022 | Jamie Jesus Alvarez |
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute 50 Grams or More of Methamphetamine | October 12, 2022 | Rafael Alfonso Garcia |

This criminal complaint is based on these facts: *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

_____
Dante Matthews, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _____February 21, 2025_____        _____
*Judge's signature*

City and state:  ___Riverside, California___        Honorable Sheri Pym, U.S. Magistrate Judge

AUSA: Peter Dahlquist

## <u>AFFIDAVIT</u>

I, Dante Matthews, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaints and arrest warrants against the following:

a.   Juan Luciano Pulido-Pech ("PULIDO-PECH") for a violation of 21 U.S.C. § 846 (Conspiracy to Distribute 50 Grams or More of Methamphetamine) between July 8, 2022 and October 12, 2022.

b.   Ricardo Perez Alcantara ("ALCANTARA") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute 50 Grams or More of Methamphetamine) on July 21, 2022.

c.   Juan Manuel Escarciga ("ESCARCIGA") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute 50 Grams or More of Methamphetamine) on July 28, 2022.

d.   Sergio Eduardo Villapando ("VILLAPANDO") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of 50 Grams or More of Methamphetamine) on July 28, 2022.

e.   Eliseo Benicia ("BENICIA") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) (Distribution of 400 Grams or More of Fentanyl) on August 3, 2022.

1

   f. Jamie Jesus Alvarez ("ALVAREZ") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) (Distribution of 400 Grams or More of Fentanyl) on August 23, 2022.

   g. Rafael Alfonso Garcia ("GARCIA") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute 50 Grams or More of Methamphetamine) on October 12, 2022.

  2. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and arrest warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

///

///

///

# Contents

I.   PURPOSE OF AFFIDAVIT...................................1

II.  BACKGROUND OF SPECIAL AGENT DANTE MATTHEWS...........4

III. SUMMARY OF PROBABLE CAUSE...........................6

IV.  STATEMENT OF PROBABLE CAUSE.........................6

   A.   DEA Confidential Source Introduces Undercover
        Agent to Mexico-Based Drug Supplier and
        Distribution Coordinator PULIDO-PECH.............6

   B.   ALCANTARA and M.A.S. Sell About Five Pounds of
        Methamphetamine to UC on June 10, 2022..........7

   C.   Law Enforcement Seizes About 14 Pounds of
        Methamphetamine from ALCANTARA and M.A.S. on July
        21, 2022.........................................9

   D.   First Transaction on July 28, 2022: Investigators
        Seize Five Pounds of Methamphetamine and $20,000
        from ESCARCIGA..................................13

   E.   Second Transaction of July 28, 2022: VILLAPANDO
        and J.J.E. Sell Five Pounds of Methamphetamine to
        CS-2............................................17

   F.   Further Identification of VILLAPANDO............18

   G.   BENICIA Sells 10,000 Fentanyl Pills to UC on
        August 2, 2022..................................19

   H.   ALVAREZ Sells 869 grams of Fentanyl to UC on
        August 23, 2022.................................20

   I.   CS-1 Meets with PULIDO-PECH on August 16, 2022..23

   J.   Minor 1 Caught Transporting 20 Pounds of
        Methamphetamine for PULIDO-PECH on August 31,
        2022............................................24

   K.   VILLAPANDO, J.J.E., and GARCIA Plan to Sell 10
        Pounds of Methamphetamine to CS-2 on October 12,
        2022............................................27

V.   CONCLUSION.........................................33

## II. <u>BACKGROUND OF SPECIAL AGENT DANTE MATTHEWS</u>

3.   I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

4.   I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been so employed since September 2020.  I am currently assigned to the Los Angeles Field Division, Riverside District Office, in Riverside, California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

5.   I attended the DEA fourteen-week training academy located in Quantico, Virginia.  While at the DEA training academy, I received formal training in investigative techniques, drug identification, and the laws pertaining to drug investigations.  I have received on-the-job training from supervisors, and other agents regarding the illegal trafficking of controlled substances.  Prior to employment as a Special Agent, I was employed as a Border Patrol Agent, where I attended a twenty-week training academy at the Federal Law Enforcement Training Center in Artesia, New Mexico, and then assigned to the Tucson Sector, Ajo Border Patrol Station for two years.

6.   By virtue of my employment as a Federal Agent, I have participated in drug investigations, which have included the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search

and arrest warrants, telephone toll analysis, the arrests of
drug traffickers, and the analysis of seized records, physical
evidence, and taped conversations.  Over the course of my
employment as a law enforcement officer, I have participated in
investigations that involve one or more of the following crimes:
possession, distribution, possession with intent to distribute,
and manufacture of controlled substances; and international
human and drug smuggling.  I have assisted in the execution of
multiple search warrants and have spoken with defendants,
confidential informants, and other witnesses who have extensive
knowledge of large-scale narcotics trafficking organizations.
In addition, I have spoken with other experienced narcotics
investigators concerning the methods and practices of drug
traffickers.

        7.  Based on my training and experience, my conversations
with other law enforcement personnel, and my own participation
in this investigation, I have become familiar with the criminal
activities of individuals involved in drug trafficking
organizations, including drug manufacturing, drug distribution,
and money laundering.  I am also aware of the tactics and
methods employed by such individuals to avoid detection by law
enforcement, including the use of multiple wireless telephones,
pre-paid cellular telephones, cloned communication devices,
debit calling cards, public pay telephones, counter-surveillance
techniques, false or fictitious identities, coded and ambiguous
language in conversations, multiple vehicles, and vehicles with
concealed compartments.

III.  **SUMMARY OF PROBABLE CAUSE**

8.   In the summer of 2022, DEA identified a Mexico-based narcotics supplier, PULIDO-PECH, who agreed to supply bulk quantities of methamphetamine and fentanyl to an undercover agent and confidential sources who were posing as drug buyers. At one point, PULIDO-PECH crossed into the United States from Mexico to meet with a confidential source to discuss the ongoing business relationship, the cost of methamphetamine and fentanyl in Mexico, and the costs of methamphetamine and fentanyl in the United States.  The confidential source wore an audio recording device during this meeting and investigators surveilled the meeting and took pictures of PULIDO-PECH.  Border crossing records also confirm that PULIDO-PECH crossed the border the day for this meeting.  PULIDO-PECH used at least 10 different couriers and local suppliers—including ALCANTARA, ESCARCIGA, VILLAPANDO, BENICIA, ALVAREZ, and GARCIA—to deliver approximately 20 kilograms methamphetamine and 2 kilograms of fentanyl to the undercover agent and confidential sources who posed as drug buyers.

IV. **STATEMENT OF PROBABLE CAUSE**

9.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A.   **DEA Confidential Source Introduces Undercover Agent to Mexico-Based Drug Supplier and Distribution Coordinator PULIDO-PECH**

10.  On June 6, 2022, a DEA confidential source (the "CS-1") provided agents with information about a Mexico-based drug

supplier, later identified during an in-person meeting as
PULIDO-PECH, who was looking for clients who could buy bulk
quantities of methamphetamine in the Los Angeles area.[1]  CS-1
agreed to connect PULIDO-PECH with an undercover DEA agent (the
"UC").  CS-1 provided the phone number of PULIDO-PECH as a
Mexican phone number ending in 5032 (the "5032 number").

11.  On June 8, 2022, CS-1 reported to the UC that PULIDO-
PECH was willing to sell five pounds of methamphetamine to a
buyer for $5,000, but PULIDO-PECH wanted to see a picture of the
money before sending the methamphetamine to the potential buyer.
DEA agents took a picture of $5,000 in a plastic bag and sent
that picture to the UC for the UC to forward to CS-1.  CS-1 then
sent the picture to the Mexico-based drug supplier, later
identified as PULIDO-PECH, at the 5032 number.

### B.    ALCANTARA and M.A.S. Sell About Five Pounds of Methamphetamine to UC on June 10, 2022

12.  On June 10, 2022, CS-1 informed DEA agents that the
Mexico-based drug supplier, later identified as PULIDO-PECH, had
agreed to a deal to sell 5 pounds of methamphetamine for $5,000.
DEA agents provided CS-1 with the UC's phone number to share
with PULIDO-PECH to finalize the transaction.

13.  At about 3:50 p.m., the UC received a phone call,
which investigators recorded, from a Mexican-based number ending
in 1373 (the "1373 number").  That unidentified user of the 1373
number said he was calling on behalf of "Hill" and had some

---

[1] CS-1 has a 2020 felony conviction for conspiracy to
traffic methamphetamine for sale and a 2018 misdemeanor
conviction for domestic violence.  He is a paid informant who
assists with investigations in exchange for compensation.

"stuff" that would be delivered.  The caller asked where the UC
was located for coordinating delivery.  The UC stated that he
was in the Riverside area, so the caller stated he would tell
the person making the delivery to make his way to Riverside.
The caller told the UC that he (the caller) would share the UC's
phone number with the person who would deliver the "stuff."

14.  At about 5:07 p.m., the UC received a phone call,
which investigators recorded, from a Mexican-based number ending
in 0670 (the "0670 number").  That caller stated that he was
near San Clemente, California.  The UC proposed meeting in
Corona, California, within Riverside County.  At about
5:25 p.m., the UC texted the 0670 number with a location on
Magnolia Avenue in Corona.  At about 7:00 p.m., a grey Honda
Civic arrived at the meeting location and parked right next to
the UC's vehicle.  There were three males in the Civic: a
driver, a front passenger, and a rear passenger seated behind
the driver.  During a traffic stop in Corona on July 21, 2022,
investigators identified ALCANTARA as the driver for this first
deal.  The UC identified the rear passenger seated behind driver
for this first deal as M.A.S.

15.  M.A.S., holding brown bag, got out of the Civic and
got into the UC's vehicle.  The UC was equipped with an audio
recording device that recorded the discussion between the UC and
M.A.S.  Once inside the UC's vehicle, M.A.S. said he had "four,"
which meant that he had four pounds of methamphetamine, but he
also explained that he had a bundle that he would need to remove
from the Civic.  M.A.S. told the UC that he would need to find a

car wash to get the additional bundle of methamphetamine.  The UC agreed to pay $4,000 for the four pounds and also agreed to wait for the other bundle too.  The UC counted out $4,000 and handed the cash to M.A.S.  As the UC counted the $4,000, ALCANTARA started to move around the Civic, opened his door, and reached into the door panel.  M.A.S. got out of the UC's vehicle and then told the UC that they would get the last bundle then (instead of going to car wash).  The UC saw ALCANTARA go to the rear passenger door on the driver's side, remove the door panel, take out a vacuum-sealed bundle, and hand it to M.A.S.  M.A.S. then wrapped the bundle in a sweater and gave it to the UC.  The UC paid M.A.S. an additional $1,000.

16.   A DEA chemical analysis report shows that the methamphetamine the UC purchased on June 10, 2022 was methamphetamine with a net weight of 2,234 grams, was 99% pure, and included 2,211 grams of pure substance.  One pound is equal to about 453 grams, so the methamphetamine weighed about 4.93 pounds.

   C.   **Law Enforcement Seizes About 14 Pounds of Methamphetamine from ALCANTARA and M.A.S. on July 21, 2022**

17.   On June 24, 2022, at about 2:45 p.m., the UC called the 0670 number and offered to buy another six pounds of methamphetamine.  During this recorded call, the user of the 0670 number stated that he was not aware of any pending drug transactions but stated he would find out.  At about 5:08 p.m., the UC received a call from the Mexican phone number ending in 1373, which is the same number used to coordinate the June 10

deal.  During this recorded call, this caller stated that he had
"product" available, but that it would not be ready for delivery
until the following morning.  The UC agreed to coordinate for a
later date and time.  At 5:39 p.m., the UC received another call
from a Mexican phone number ending in 8389 (the "8389 number").
During this recorded call, this caller identified himself as the
person who had sold him the five pounds of methamphetamine and
then asked the UC how much he wanted.  The UC responded, "six
windows" (meaning six pounds of methamphetamine).  The caller
stated that the product was still in Mexico and he could not get
it across the border until between 10:30 p.m. and 11:00 p.m.
The UC responded by stating that they could arrange a
transaction for another day.

        18.  On July 14, 2022, at about 4:55 p.m., during a
recorded call, the UC spoke to the user of the 8389 number and
asked if he could buy "16" for "$900" each (meaning 16 pounds of
methamphetamine for $900 per pound).  Over the next few days,
the UC engaged in a series of recorded calls with the user of
the 0670 number.  The user of the 0670 number said he would
arrive in the same car that he had used for the previous deal,
which was a grey Honda Civic.  The UC agreed to meet on July 21,
2022, in Corona, California.

        19.  On July 21, 2022, DEA agents and local investigators
identified the grey Civic as it passed through Corona.  At about
6:58 p.m., Corona Police Department Officers conducted a traffic
stop on the Civic for a window tint violation and for having no
front license plate.  ALCANTARA was the driver and M.A.S. was in

the passenger seat.  A canine officer then arrived on the scene and the canine alerted to the odor of narcotics emanating from the Civic.  Investigators then searched the Civic and found a black trash back in the trunk that contained 13 individually packaged bags of suspected methamphetamine.  Both ALCANTARA and M.A.S. were then taken to the Corona Police Department to be interviewed.

20.  On July 21, 2022, during a *Mirandized* interview, M.A.S. told Corona Police Department investigators that he saw a woman place the bag in the trunk of the vehicle, but ALCANTARA did not tell him what the bag was in ALCANTARA's car.

21.  On July 21, 2022, during a *Mirandized* interview that was captured on body-worn camera, ALCANTARA stated, in substance and part only, that M.A.S. put the bag in his trunk.  In response to a follow-up question, ALCANTARA invoked his right to counsel.

22.  The next day, on July 22, 2022, ALCANTARA spoke with me and a DEA Intelligence Research Specialist because ALCANTARA wanted to know what was going to happen next with the investigation.  That audio-recorded *Mirandized* interview conducted in English and lasting about an hour and 30 minutes, and in substance and part only, included the following:

a.  I told ALCANTARA, "alright, so, since you came to us, we'll go ahead and let you, tell us, if you wanna to ask you something to break it open, let us know. . . ."  ALCANTARA stated, "I would like to know what questions . . . I wanna know what's going to happen . . . ." or words to that effect.  I told

ALCANTARA, "we wanna know what you know about what was in your car." I then said, "it sounded like you came to the conclusion that it would be better to talk to us and actually tell us what you knew about it rather than giving us the runaround," and ALCANRATA said, "yea." I went on to say, "so that's pretty much what we want to know."

b.    ALCANRA initially stated M.A.S. was a friend from high school and that he was just giving M.A.S. a ride. During the interview, ALCANTARA stated that he generally transports money from the United States to Ensenada, Mexico, and that he received $1,000 for each trip. He said he would also get money in advance to pay for gas, food, and a hotel room for one night. ALCANTARA said that this was the first time he transported drugs.[2]

c.    ALCANTARA said he and M.A.S. stopped at a house in Hemet, California, backed into a driveway, popped the trunk, and then a woman placed the bag in his trunk. ALCANTARA stated he asked M.A.S. if there was cash in the bag and M.A.S. told him no and said they were going to drop it off. ALCANTARA stated that M.A.S. then started getting a lot of calls.

d.    ALCANTARA confirmed that M.A.S. uses the Mexican phone with number ending in 0670. With ALCANTARA's permission, I reviewed the contents of his phone, and I confirmed that ALCANTARA has a contact saved in his phone as "Moises Hermano" and the contact number was the 0670 number.

---

[2] ALCANTARA also participated in the June 10, 2022 deal.

23.  A DEA chemical analysis report shows that the methamphetamine seized on July 21, 2022 was methamphetamine with a net weight of 6.1 kilograms, was 99% pure, and included 6 kilograms of pure substance.  One pound is equal to about .453 kilograms, so the methamphetamine weighed about 13.4 pounds.

**D.   First Transaction on July 28, 2022: Investigators Seize Five Pounds of Methamphetamine and $20,000 from ESCARCIGA**

24.  On July 27, 2022, CS-1 coordinated with PULIDO-PECH for the sale of five pounds of methamphetamine.  The same day, the UC received a call from the 8389 number.  During that recorded call, the user of the 8389 number stated that he received a phone call regarding a sale of five pounds of methamphetamine and was wondering if it was for the UC.  The UC told the user of the 8389 number that the sale was for a friend, and that the friend would coordinate the deal.  The UC then shared another DEA confidential source's ("CS-2") phone number with the user of the 8389 number to arrange the deal.[3]  CS-2 received a call from a United States phone number ending in 9270 ("the 9270 number") and arranged to buy five pounds of methamphetamine at a Target parking lot in Riverside on July 28, 2022.  Following this conversation, the 8389 number shared with the UC a United States phone number ending in 1791 (the "1791 number") to set up the five-pound methamphetamine deal with CS-2, and told the UC that CS-2 should not call the 9270 number anymore.  However, CS-2 continued communicating with both the

---

[3] CS-2 has a 2007 misdemeanor conviction for DUI.  He is a paid informant who assists with investigations in exchange for compensation.

user of 9270 number and the user of 1791 number to coordinate two separate deliveries of five pounds of methamphetamine on July 28, 2022.  Investigators planned to do one controlled purchase with the supplier who was using the 1791 number, believed to be PULIDO-PECH's new supplier, and then planned to try to conduct a traffic stop on the supplier using the 9270 number.

25.  At about 5:34 p.m., the user of the 9270 number sent CS-2 a text message saying that he would arrive (at a Target parking lot in Riverside) in 8 minutes.  At about 5:43 p.m., an agent saw a man, later identified as ESCARCIGA, and another Hispanic man standing in the Target parking lot next to a gold-colored Acura sedan.  At this point, CS-2 stopped responding messages and/or calls from the 9270 number.  The agent then saw ESCARCIGA and the other Hispanic man walk into the Target store. At about 6:23 p.m., another investigator saw ESCARCIGA and the other Hispanic man leave the store.  At about 6:42 p.m., ESCARCIGA and the other man then got into the Acura and drove off.

26.  At 6:46 p.m., Riverside Sheriff's Deputy and canine handler Juan Salcido conducted a traffic stop on the Acura for failing to stop behind a limit line while making a U-turn at a red signal, in violation of the California Vehicle Code.  During the traffic stop, ESCARCIGA told Deputy Salcido that he had been visiting a friend in Banning and was heading back to Hacienda Heights.  ESCARCIGA then said he was coming from Target.  Deputy Salcido asked why ESCARCIGA was shopping at Target in Riverside

14

if he lived in Hacienda Heights, and ESCARCIGA said he had just
dropped off a friend in Hemet.  The officer then spoke with the
passenger and asked the passenger where they were coming from
and where they were going.  The passenger said they were
supposed to meet ESCARCIGA's friend.  The passenger said
ESCARCIGA asked him to come along for a ride to Target.  Deputy
Salcido asked ESCARCIGA for permission to search the Acura, and
ESCARCIGA said he did not want the officer to search his
vehicle.

27. Deputy Salcido then had his canine, "Rocky," walk
alongside the Acura.  Rocky alerted to the odor of narcotics
emanating from the Acura.  ESCARCIGA then stated that he had
marijuana in the center console.  Deputy Salcido noted in his
report that Rocky is not certified to detect the order of
marijuana.  Deputy Salcido searched the Acura.  He found a small
amount of marijuana in the center console.  The trunk did not
open, and ESCARCIGA said the trunk did not work and he had never
been able to open it.  Deputy Salcido accessed the trunk through
the rear seat access and found a white plastic bag that had five
packages wrapped in aluminum foil, with each containing a white
crystalline substance.

28. During a *Mirandized* interview, ESCARCIGA stated, in
substance and part only, the following:

a.   ESCARCIGA stated he lived in Hacienda Heights
with family.

b.   ESCARCIGA stated he knew about the five, one-
pound bundles of methamphetamine.  ESCARCIGA said he was given

money and five, one-pound methamphetamine bundles at the same time, and was instructed to deliver the money to an unknown female later.[4]

       c.   ESCARCIGA stated there would not be any additional narcotics at his residence, but he stated he did have approximately $20,000 dollars in his bedroom. ESCARCIGA stated the money was not his and was holding from a Hispanic male who lived in Mexico. ESCARCIGA then signed a consent to search form for his residence and told investigators exactly where the money was located.

       d.   ESCARCIGA agreed to ride to his residence and wait with investigators while they recovered the money.

   29.   Investigators arrived at ESCARCIGA's residence, and with the consent of ESCARCIGA's family, entered ESCARCIGA's bedroom and found a brown bag that contained $22,897. Investigators did not find any additional narcotics.

   30.   A DEA chemical analysis report shows that the methamphetamine seized on July 28, 2022 from the trunk of the Acura was methamphetamine with a net weight of 2,142 grams, was 99% pure, and included 2,120 grams of pure substance. One pound is equal to about 453 grams, so the methamphetamine weighed about 4.7 pounds.

---

   [4] Investigators did not find money in the car so I believe ESCARCIGA may have been referring to the money that investigators found at his house.

**E.    Second Transaction of July 28, 2022: VILLAPANDO and J.J.E. Sell Five Pounds of Methamphetamine to CS-2**

31.  After the user of the 8389 number provided the UC the 1791 number as the number for a new supplier for five pounds of methamphetamine, CS-2 began coordinating with the user of that number.  CS-2 agreed to meet the user of the 1791 number at an LA Fitness parking lot in Riverside to buy the methamphetamine on July 28, 2022.

32.  On July 28, 2022, at about 5:10 p.m., the user of the 1791 number sent a text message to CS-2 stating he would arrive in seven minutes, with an accompanying photo taken from the passenger seat of a vehicle on the highway with a black hood. At about 5:25 p.m., the user of the 1791 number called CS-2 and said he arrived at the LA Fitness parking lot and was in a Nissan Versa.  At the same time, I saw a black Nissan Versa park next to CS-2's vehicle.  The Nissan was registered to J.J.E.

33.  I saw a man, who I later identified VILLAPANDO, exit the passenger front seat of the Nissan and give CS-2 a pink backpack in exchange for money.  I saw VILLALPANDO was wearing shorts and a short sleeve tee shirt.  I also saw that VILLALPANDO had tattoos covering most of his left arm and the lower half of his left leg.

34.  DEA investigators took possession of the pink backpack following the purchase and found that it contained suspected methamphetamine.  A DEA chemical analysis report shows that the methamphetamine seized on July 28, 2022, from the pink backpack was methamphetamine with a net weight of 1,994 grams, was 93%

17

pure, and included 1,854 grams of pure substance.  One pound is equal to about 453 grams, so the methamphetamine weighed about 4.1 pounds.

**F.    Further Identification of VILLAPANDO**

35.  On August 16, 2022, investigators secured a warrant signed by the Honorable Sheri Pym authorizing the use of a cell-site simulator to further assist investigators in identify the user of the 1791 number.  On August 25, 2022, using location information for the 1791 number, DEA investigators conducted surveillance near the vicinity of N. Oakbank Drive in Covina, California.  I concluded that VILLAPANDO was the user of the 1791 number by using the cell-site simulator after seeing him in the area of the signal for the 1791 number.  While conducting surveillance, investigators also saw J.J.E., driving the black Nissan registered in his name, arrive at the residence in which investigators believed VILLAPANDO was residing.  Investigators also saw a Toyota Tacoma with license plate number ending in 3Y2 registered to VILLAPANDO and S.J.I. parked in the driveway of the residence.

36.  While conducting surveillance, investigators saw VILLAPANDO get into J.J.E.'s Nissan.  Investigators followed the Nissan to Porto's Bakery.  Once at Porto's Bakery, I followed VILLAPANDO and J.J.E. inside and stood behind them in line.  While in line, I got a clear view of VILLAPANDO and saw that he had a tattoo behind his left ear and a tattoo sleeve covering his left arm.  I also took several pictures of VILLAPANDO that

show VILLAPANDO's face and show that he was wearing a Puma-brand BMW T-shirt that day.

**G.   BENICIA Sells 10,000 Fentanyl Pills to UC on August 2, 2022**

37.   On July 27, 2022, during a recorded call, the user of the 8389 number offered to sell the UC 10,000 fentanyl pills for $6,000.

38.   On August 1, 2022, the UC called the 8389 number, and during a recorded call, coordinated the purchase of 10,000 counterfeit pills on August 3, 2022.

39.   On August 2, 2022, the user of United States phone number ending in 3994 (the "3994 number") called the UC and coordinated to meet at a Vallarta Supermarket in Panorama City, California, on August 3, 2022.

40.   On August 3, 2022, at about 11:56 a.m., the UC called the user of the 3994 number and said he had arrived at the agreed-upon meeting location.  The user of the 3994 number told the UC that he would arrive in 10 minutes in a white car.

41.   At about 12:01 p.m., a DEA agent saw BENECIA, driving a white Honda Accord registered to his own name, park in the Vallarta parking lot near the UC vehicle.  A DEA agent watched the UC walk to the driver's side of BENICIA's Honda and talk to BENICIA through the driver's side window.  Another DEA agent saw BENICIA pass a brown paper bag to the UC through the window. The DEA agents then saw the UC and BENICIA walk to and enter the UC's vehicle briefly.  A video recording device hidden in the UC's captured this transaction.  While in the UC's vehicle,

BENICIA and the UC discussed the price and quantity of pills. The UC then handed BENICIA the money and BENICIA counted it in the UC's vehicle before getting back into his own vehicle and driving away.

42.    Investigators received BENICIA's driver's license photo from the California Department of Motor Vehicles. Investigators compared the driver's license photo against video captured from inside the UC's vehicle during the purchase and confirmed it was the same person.

43.    A DEA chemical analysis report shows that the pills seized on August 3, 2022 from the brown paper bag were fentanyl with a net weight of 1,104 grams.

### H.    ALVAREZ Sells 869 grams of Fentanyl to UC on August 23, 2022

44.    On August 9, 2022, the 8389 number called the UC and asked if the UC knew anyone interested in buying "la Morena," which the UC knew to be Mexican slang for a kilogram of black tar heroin, for $14,000.

45.    On August 11, 2022, the UC called the user of the 8389 number, and in a recorded call, offered to buy the heroin the following week.

46.    On August 16, 2022, the user of United States phone number ending in 9977 (the "9977 number") called the UC and asked to meet the UC the next day to deliver the heroin.  The UC and the user of the 9977 number exchanged text messages and agreed to meet at a Walmart in Anaheim.  On August 17, 2022, the user of the 9977 number cancelled the meeting.

47.  On August 18, 2022, the user of the 8389 number called the UC, and in a recorded call, apologized that the user of the 9977 number cancelled the heroin sale.  The user of the 8389 number gave the UC the United States phone number ending in 6219 (the "6219 number") as the number for the person who could deliver the heroin to the UC.  The UC called the user of the 6219 number, and in a series of recorded calls over a few days, they coordinated to complete the heroin sale on August 23, 2022, in Los Angeles.

48.  On August 23, 2022, the user of 6219 number gave the UC an address in Los Angeles to meet the person delivering the heroin.

49.  At approximately 2:45 p.m., DEA investigators set up surveillance around the meeting location in anticipation for the controlled purchase with the UC.

50.  At about 4:42 p.m., DEA investigators saw a dark Infiniti SUV with California license plate ending in 792 park near the meeting site.  Investigators then saw ALVAREZ exit the Infiniti carrying a white plastic bag.  Investigators saw ALVAREZ let himself into a property near the meeting location through a gate.

51.  At about 5:20 p.m., the UC called the user of the 6219 number to inform him that the UC was at the meeting location.

52.  At about 5:24 p.m., DEA investigators saw ALVAREZ leave the property near the meeting location in the Infiniti SUV.

53. At about 5:27 p.m., investigators, along with a DEA Aviation unit, saw ALVAREZ pull up and park next to the UC's vehicle.  Investigators saw ALVAREZ get out of the Infiniti SUV and walk towards the driver's side of the UC vehicle.

54. At about 5:29 p.m., investigators saw ALVAREZ return to the Infiniti SUV.  ALVAREZ then returned and enter into the passenger side of the UC vehicle.  Investigators monitored a covert recording device in which they heard the UC inform ALVAREZ, in Spanish, that he was paying thirteen (meaning he was $13,000 for the kilogram of heroin).  Investigators had also placed a video recording device inside the UC vehicle that captured video of ALVAREZ during this deal.

55. At about 5:30 p.m., investigators saw ALVAREZ return to Infiniti SUV and drive away.  DEA aviation units maintained continuous mobile surveillance on ALVAREZ as he returned to the same property where a DEA surveillance agent first saw him.

56. Investigators received ALVAREZ's driver's license photo from the California Department of Motor Vehicles. Investigators compared the driver's license photo against video captured from inside the UC's vehicle during the purchase and confirmed it was the same person.

57. A DEA chemical analysis report shows that the substance seized on August 23, 2022 from ALVAREZ was a substance containing fentanyl made to look like black tar heroin, with a net weight of 869 grams.

### I.    CS-1 Meets with PULIDO-PECH on August 16, 2022

58.    In August 2022, CS-1 and PULIDO-PECH arranged to meet at a Hooters Restaurant in San Diego, California, on August 16, 2022, to discuss narcotics deals, and an additional deal for a car that PULIDO-PECH would be selling to a buyer that CS-1 stated he knew.  PULIDO-PECH used Mexican phone number ending in 4056 (the "4056 number") and the 5032 number to arrange this meeting with CS-1.

59.    On August 23, 2022, at about 1:30 p.m., PULIDO-PECH called CS-1 to say that he was in line to cross into the United States from Mexico through the Otay Mesa Port of Entry, and that there was an extremely long line.

60.    At about 3:45 p.m., Homeland Security Investigations ("HSI") agents working with DEA received a notice that a Mercedes with California license plate 990 crossed the Otay Mesa Port of Entry driven by PULIDO-PECH.

61.    At about 4:25 p.m., a DEA agent saw the Mercedes arrive at the Hooters parking.  Another DEA agent monitoring a covert transmitter worn by CS-1 confirmed CS-1 guided PULIDO-PECH to CS-1's location in the lot.

62.    At about 4:26 p.m., DEA investigators saw CS-1 get into the passenger side of the Mercedes.  Investigators then watched the Mercedes drive away from the Hooters and park in front of Chase Bank within the same parking lot.  DEA investigators continued to monitor the covert transmitter as PULIDO-PECH and CS-1 discussed narcotic sales activities.  PULIDO-PECH discussed, related in substance and part only, drug

prices, including the costs of transporting fentanyl and
methamphetamine into the United States.  Regarding the cost of
methamphetamine, PULIDO-PECH told CS-1 that his contact pays
$350 per pound when buying wholesale in Mexico, then pays an
additional $250 United States dollars for each pound to be
transported into the United States.  The price offered to
PULIDO-PECH from his contact for methamphetamine that is in Los
Angeles is between $800 and $950 United States dollars per
pound.

63.  At approximately 5:40 p.m., DEA investigators saw
PULIDO-PECH cross back into Mexico through the pedestrian lane
at the Otay Mesa Port of Entry.  PULIDO-PECH left the Mercedes
parked with CS-1 with the expectation that CS-1 would try to
sell it.

**J.   Minor 1 Caught Transporting 20 Pounds of
Methamphetamine for PULIDO-PECH on August 31, 2022**

64.  On August 26, 2022, the UC received a phone call from
the 8389 number.  The 8389 number told the UC that he had 20
"Windows" available.  The UC was aware that "windows" is coded
language for crystal methamphetamine.

65.  On August 29, 2022, the UC placed a call to the 8389
number and told him that the UC would come down the following
day to pick up the methamphetamine.  At approximately 8:33 p.m.,
the UC received a phone call from a Hispanic male using the
Mexican phone number ending in 3920 (the "3920 number")
regarding the methamphetamine purchase.  The user of the 3920
number wanted the UC to come early, before noon, and to meet in

Los Angeles.  The user of the 3920 number wanted to confirm the amount that the UC would pay, and said he was told the UC would pay $14,000.  The UC and the user of the 3920 number agreed to meet the following day.  At about 8:34 p.m., the UC placed a call to the 8389 number, and the UC confirmed that contact was made with the user of the 3920 number.

66.  On August 30, 2022, at about 1:55 p.m., the UC placed a phone call to the 8389 number and reported the UC was unable to contact the user of the 3920 number.  At about 2:02 p.m., the user of the 8389 number called the UC and told the UC not to answer the phone call from the user of the 3920 number and that someone else would call the UC.  At about 2:21 p.m., the UC received a phone call from the user of Mexican phone number ending in 4928 (the "4928 number").  The user of the 4928 number said he was calling about the "20."  The UC and the user of 4928 number agreed to meet the following day around 2:00 p.m. in Riverside.  At about 7:12 p.m., the user of the 4928 number asked if the UC could meet in Santa Ana or Anaheim because the "kid" did not have a car.  The UC told the user of the 4928 number that the UC would contact him the following day.

67.  On August 31, 2022, at about 12:03 p.m., the UC received a phone call from the user of the 4928 number, and the UC agreed to arrive at a meeting location at around 2:00 p.m. At about 12:12 p.m., the user of phone number ending in 4928 sent the UC an address of on North Kellogg Dr., Anaheim, California, and asked the UC to meet at that location.

68. At about 2:05 p.m., the UC told the user of the 4928 number that the UC was in the area. The user of the 4928 number asked the UC at which location he/she had arrived because the "kid" would be walking. The UC asked for the user of the 4928 number to have the person delivering the drugs to call the UC directly. At about 2:38 p.m., the UC received a phone call from the Minor 1, who said he was the one who would deliver the "20" and asked were to meet. At this point, the UC asked the Minor 1 to send his address to determine how far the UC was from Minor 1. The UC received a text message from the Minor 1 with an address on W. Ball Rd, Anaheim, California. At about 3:16 p.m., the UC placed a call to the Minor 1 and asked to confirm the address, to which the Minor 1 gave the same address on W. Ball Rd, Anaheim, California. The UC told the Minor 1 that the location was still about an hour away from the UC's location. The Minor 1 and the UC agreed to meet in the middle. At approximately 3:45 p.m., the UC received a phone call from the 8389 number and provided the address for a meeting at a Cardenas store in Corona, California.

69. While the UC was coordinating with the Minor 1, investigators conducting surveillance in the area of W. Ball Rd saw Minor 1 carrying a duffel bag slung across his body.

70. At approximately 4:32 p.m., SA Ivan Rodriguez saw Minor 1 get into the rear seat of a white Honda Accord with an Uber logo. Investigators maintained continuous mobile surveillance on the vehicle.

71.  California Highway Patrol Officer E. Granado initiated a traffic stop on the Accord for a tinted windows violation and because the driver was operating a cell phone while driving. During the stop, Officer Granado requested permission from the driver to search the vehicle and the driver consented.  Officer Granado ran his service canine on the exterior and interior of the vehicle, and the service canine alerted to the odor of narcotics.  Officer Granado searched the vehicle and found two large bundles of suspected methamphetamine in a duffle bag that was in the back seat next to where Minor 1 was sitting.

72.  A DEA chemical analysis report shows that the methamphetamine seized on August 31, 2022 from the duffel bag was methamphetamine with a net weight of 8,985 grams, was 97% pure, and included 8,715 grams of pure substance.  One pound is equal to about 453 grams, so the methamphetamine weighed about 19.8 pounds.

**K.    VILLAPANDO, J.J.E., and GARCIA Plan to Sell 10 Pounds of Methamphetamine to CS-2 on October 12, 2022**

73.  Between October 4, 2022, and October 11, 2022, CS-2 and the user of the 1791 number (the same used in the leadup to the July 28, 2022 deal and the same number location information that revealed the identity of VILLAPANDO) exchanged text messages and talked on the phone to coordinate the sale of 20 pounds of methamphetamine at a Lowe's parking lot in Chino Hills, California, on October 12, 2022.

74. On October 12, 2022, at about 2:00 p.m., DEA surveillance units established ground surveillance at a

residence where investigators concluded VILLAPANDO resided based on prior surveillance.  While conducting surveillance at the residence on October 12, I saw VILLAPANDO, J.J.E., and J.J.E.'s Nissan Versa at the residence.  Through binoculars, I could see VILLAPANDO and saw he was wearing the same Puma-brand BMW T-shirt that he was wearing on August 25, 2022.

75.  At about 3:52 p.m., investigators saw J.J.E. get into the driver's side of the Nissan and VILLAPANDO get into the passenger side of the Nissan.  DEA aviation units saw the Nissan leave the residence and maintained continuous mobile surveillance on the Nissan.

76.  At about 4:25 p.m., investigators saw the Nissan arrive and park near a Hobby Lobby located on Chino Hills Pkwy, Chino Hills, California.

77.  At about 4:37 p.m., investigators saw a dark grey, 2006 Acura TL and a black, 2018 BMW at the Lowe's parking lot located at 4777 Chino Hills Pkwy.  Investigators saw a bag being moved from the BMW to the rear, driver's side seat of the Acura. SA Blevens then saw the two vehicles drive to the location of the Nissan that was parked in the adjacent parking lot.

78.  At about 4:39 p.m., the DEA aviation unit saw J.J.E. leave the driver's side of the Nissan and get into the passenger side of the Acura.  The DEA aviation unit then saw VILLAPANDO move from the passenger side of the Nissan into the driver's seat. VILLAPANDO drove away in the Nissan shortly thereafter followed by the Acura driven by an unidentified male, with J.J.E. in the passenger seat.

79. At about 4:46 p.m., Deputy Sullivan Brown from the Chino Hills Station of the San Bernardino County Sheriff's Department initiated a traffic stop on the Nissan driven by VILLAPANDO for tint on the front windows of the vehicle. VILLAPANDO was cited for driving without a valid license. The Nissan was subsequently towed.

80. At about 4:46 p.m., the DEA aviation unit saw J.J.E. and the unidentified male park the Acura near a residence located at Bluebell Dr. and Eucalyptus Ave. in Chino Hills, California. The DEA aviation unit saw J.J.E. and the unidentified male abandon the vehicle and begin walking through the neighborhood on foot. The two men appeared to be using their phones frequently as they were observed walking.

81. At about 4:55 p.m., J.J.E. and the unidentified male returned to the vicinity of the Acura.

82. At about 5:00 p.m., the DEA aviation unit saw the BMW, being driven by GARCIA, arrive and park next to the Acura. The DEA aviation unit then saw the unidentified male remove a large black trash bag from the Acura and place it into the trunk of the BMW. The BMW drove away shortly thereafter, and DEA ground and aviation units maintained surveillance of the BMW.

83. At about 5:02 p.m., a DEA Task Force Officer initiated a traffic stop of the BMW driven by GARCIA. GARCIA yielded to the stop on Eucalyptus Ave., but as the Task Force Officer exited her vehicle to contact GARCIA, GARCIA made a U-turn into oncoming traffic and sped away.

84.  The DEA aviation unit maintained surveillance of GARCIA as he sped off.  The DEA aviation unit saw GARCIA cross into oncoming traffic and fail to yield at intersections and red lights, among other traffic violations.

85.  At about 5:11 p.m., DEA investigators saw GARCIA arrive and park at a residence located on Fernleaf Ave., Pomona, California.  The DEA aviation unit saw GARCIA get out of the BMW and go into the back entrance of the residence.

86.  At about 5:15 p.m., DEA investigators saw GARCIA exit the residence and walk down Fernleaf Ave.  The DEA aviation unit maintained surveillance and watched as GARCIA paced up and down Fernleaf Ave. for about one hour.

87.  At about 6:11 p.m., a unit from the Pomona Police Department Gang Task Force approached GARCIA.

88.  Shortly thereafter, DEA investigators arrived and spoke to GARCIA.  GARCIA provided written and verbal consent to investigators to search his vehicle, the black BMW.

89.  At about 6:50 p.m., a Pomona Police Department K9 Officer arrived at the residence and conducted a sniff on the exterior of the BMW.  The K9 alerted to the presence of narcotics.

90.  DEA investigators searched the BMW and found a black trash bag that was not tied or sealed.  In the bag, investigators found multiple bundles of methamphetamine that appeared to be wrapped in cellophane and vacuum sealed, with a line tied to the bundles which investigators recognized as a

technique used to retrieve narcotics when they are placed in hard to reach or hard to access areas.

91.    At the time of the seizure, GARCIA was also detained and transported to the DEA Riverside District Office for an interview.  During a *Mirandized*, unrecorded interview with two agents, GARCIA stated, in substance and part only, the following:

   a.    GARCIA stated that earlier in the day on October 12, 2022, a friend that GARCIA only knows as "Urpapa" asked GARCIA to pick up "stuff."  GARCIA stated that Urpapa sent messages on Snapchat around 1:00 p.m., 2:00 p.m., or 3:00 p.m. GARCIA stated that he did not know how much he was going to get paid to make the pick-up for Urpapa, but he thought he would be paid a couple hundred dollars.

   b.    GARCIA stated that he was later contacted by Urpapa to pick up a bag.  GARCIA stated that he thought the bag contained marijuana.  GARCIA stated that Urpapa gave him an address in Chino, California, to pick up the bag.  GARCIA stated that he met someone in a shopping center near the soccer park in Chino, California.  GARCIA stated that the person he met gave GARCIA a black bag.  GARCIA stated he then was told to bring the bag to Urpapa.

   c.    GARCIA stated he met with Urpapa in a shopping center in Chino Hills and passed the bag to Urpapa in a grey Acura.  GARCIA stated that after he passed the bag to Urpapa, Urpapa called GARCIA and told him to come back.  GARCIA stated he came to where Urpapa was parked, pulled up next to him,

Urpapa passed the bag back to GARCIA, and told GARCIA to drive away. GARCIA stated as he was driving away, he saw a Dodge Durango pulling him over. GARCIA stated he called Urpapa and Urpapa told him it was a "set-up." GARCIA stated that he drove away from the car pulling him over and drove to his girlfriend "Kiera's" house.

       d. GARCIA agreed to allow investigators to search his iPhone and signed a "CONSENT TO SEARCH FORM." Investigators searched GARCIA's iPhone and observed several pictures and conversations involving pills and cocaine. Investigators asked GARCIA about the content of the phone, and GARCIA stated that he acts as a middle man for the sale of narcotics. GARICA stated that a kilogram of cocaine goes for approximately $16,000 to $17,000, but GARCIA only makes $250 for the sale.

      92. A DEA chemical analysis report shows that the methamphetamine seized on August 31, 2022 from the duffel bag was methamphetamine with a net weight of 6,710 grams, was 97% pure, and included 6,500 grams of pure substance. One pound is equal to about 453 grams, so the methamphetamine weighed about 14.8 pounds.

///

///

///

## V.  <u>CONCLUSION</u>

93.  For all of the reasons described above, there is
probable cause to believe that PULIDO-PECH, ALCANTARA,
ESCARCIGA, VILLAPANDO, BENICIA, ALVAREZ, and GARCIA committed
the violations outlined in paragraph 1 of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>21st</u> day of
February 2025.

_____

HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE